UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

Plaintiff

v.

KURBONALI SULTANOV

Defendant

Criminal Docket No. 22-149 (NRM)

---

Defendant Kurbonali Sultanov, by and through his attorneys, Igor Niman, Esq., hereby moves the Hon. Nina R. Morrison, United States District Judge in the U.S. District Court Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York, 11201 for the following relief:

1. Suppression of evidence and statements for violations of Mr. Sultonov's Fourth and Fifth Amendment rights;

2. All other relief as this Court finds just and proper.

Date: Brooklyn, New York
February 6, 2023

Respectfully submitted,

/s/ Igor Niman
Igor Niman, Esq.
Attorney at Law
1909 East 17th Street
Brooklyn, NY 11229
Phone: (718) 382-1689
Fax: (718) 228-6633
Email: igor_niman@yahoo.com

To: Nina Gupta
Assistant United States Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff

v.

KURBONALI SULTANOV

Defendant

Criminal Docket No. 22-149 (NRM)

# AFFIRMATION IN SUPPORT Motion to Suppress

Igor Niman, Esq., affirms to be true and states under penalty of perjury as follows:

1. I am the attorney for the defendant, Kurbonali Sultanov, and I make this affidavit in support of the foregoing pretrial motion.

2. The Court should suppress evidence and statements obtained by CBP when Mr. Sultanov was stopped at the JFK Airport in Queens, New York, and it should suppress evidence and gathered at the execution of the search warrant on March 17, 2022 relating to Mr. Sultanov's cell phones. These seizures and the solicitation of statements all violated Mr. Sultanov's rights under the Fourth and Fifth Amendments to the U.S. Constitution.

   **i. Evidence obtained by CBP from Mr. Sultanov's mobile phone at the U.S. border in March 5, 2022 should be suppressed**

3. The government will likely argue that evidence obtained from Mr. Sultanov's cell phone when he re-entered the U.S. on March 5, 2022 will be admissible under the so-called "free border-search" exception to the Fourth Amendment's warrant requirement.

4. This argument will be wrong. The "free" border search is a dragnet designed to prevent entry of contraband, specifically by foreign nationals entering the country. Like any other dragnet, it is not designed to provide a loophole to further previously existing law

enforcement investigations, particularly if the target is a U.S. citizen re-entering the country.

5. The warrant search application that was provided as part of discovery states that the cell phone was checked as part of routine check, without citing an existence of any reasonable suspicion with respect to the contents of Mr. Sultanov's phone, prior the initial border search was conducted.

6. Defendant contends that the search fell outside the bounds of a regular border search exception.

### a. The background of border search exception

7. The concept of a border search exception was articulated by <u>United States v. Ramsey</u>, 431 U.S. 606 (1977) where Supreme Court endorsed the notion that "the border search as "reasonable" within the Fourth Amendment even though there be neither probable cause nor a warrant." Subsequently, in <u>United Staes v. Montoya</u>, 473 U.S. 531, 538 (1985) the Court stated that

8. In <u>United States v. Montoya de Hernandez</u>, the Court first articulated two different levels of searches at the border; routine searches and nonroutine searches. 473 U.S. at 538, 541 (1985). "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." <u>Id</u>. at 538. The distinction turns on the extent to which the search is an invasion of privacy, as balanced against the government's interest to search at the border. <u>United States v. Flores-Montano</u>, 541 U.S. 149, 152 (2004).

9. Consequently, certain searches, classified as "nonroutine," require reasonable suspicion of wrongdoing to pass constitutional muster. United States v. Montoya de Hernandez, 473 U.S. at 541.

10. Even at the border, however, an individual is entitled to be free from unreasonable search and seizure and his or her privacy interests must be balanced against the sovereign's interests. Id. at 539. ("Having presented herself at the border for admission, and having subjected herself to the criminal enforcement powers of the Federal Government, 19 U.S.C. § 482, respondent was entitled to be free from unreasonable search and seizure. But not only is the expectation of privacy less at the border than in the interior.")

11. The Second Circuit defined routine searches to "include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's *privacy rights*." United States v. Irving, 452 F.3d 110, 123 (2nd Dept. 2006) (emphasis added); citing United States v. Grotke, 702 F.2d 49, 51–52 (2d Cir.1983).

12. The search of the cell phone, as it described in Reilly v. California, 573 U.S. 373, 378, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014), is linked to the paramount privacy interests that people possess in their cell phones, thus "implicate *privacy concerns far beyond* those implicated by the search of a cigarette pack, a wallet, or a purse." Id. at 393 [emphasis added].

13. Additionally, in Reilly v. California, Supreme Court held that police officers generally may not, without a warrant, search information on the cell phone of an arrestee, based on the heightened implication of privacy, in comparison to other items, such as notebooks or purse. Id. at 373.

14. The same logic was used by the Supreme Court in border related searches. The Supreme Court has suggested that "in the case of highly intrusive searches" where salient "dignity and *privacy interests*" are at stake, "a requirement of suspicion" might be needed. United States v. Flores-Montano, 541 U.S. at 152. (emphasis added).

15. Therefore, the plain reading of United States v. Irving and Reilly v. California, suggests that the search of the cell phone is a non-routine border search due to the substantial infringement of the traveler's privacy rights.

16. This logic is supported by Supreme Court's reasoning in Reilly v. California, where it was noted that as a result of the immense storage capacity of cell phones, the special sensitivity of information stored on them, and the pervasiveness with which people carry and use them, cell phones are fundamentally different "in both a quantitative and qualitative sense from other objects traditionally subject to government searches." 573 U.S. at 391.

17. The heightened privacy rights associated with a cell phone were explained by the Court, since "It is no exaggeration to say that many of the more than 90% of American adults who own cell phones keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." Id. at 393.

18. For these reasons, the Supreme Court concluded that, "[a]llowing the police to scrutinize such records *on a routine basi*s is quite different from allowing them to search a personal item or two in the occasional case." Id. (emphasis added).

19. The plain reading of United States v. Irving, that defines non-routine search as something more intrusive than searching of the purse, an item that resembles luggage, and a cell phone that clearly contains information that directly affects privacy rights, suggests that

the border search of the cell phone is not a routine affair. On the other hand, the reading of Reilly v. California suggests that police shall not be able to scrutinize such records on routine basis, also demonstrates that the search of the cell phone in it of itself is not a routine search.

20. Therefore, since nonroutine search requires reasonable suspicion, which was not present in Mr. Sultanov's case, the entire evidence that was derived from the nonroutine border search of his phone shall be suppressed.

21  The Government may make a separate suggestion, in an attempt to differentiate the instant border search and the situation in Reilly v. California, where the cell phone was not searched at the border, by stating that even if such search was nonroutine, the border search exception would still allow the search of the phone

22. However, the border search exception does not provide border patrol officers blank exception to routine searches conducted at the border. The Court of Appeals in United States v. Cano, 934 F.3d 1002 1011 (9th Cir. 2019) held that "Exceptions to the warrant requirement are subject to two important constraints. First, any search conducted under an exception must be within the *scope* of the exception. Second, some searches, even when conducted within the scope of the exception, are so *intrusive* that they require additional justification, up to and including probable cause and a warrant."

23. Coming back to the logic outlined in Reilly v. California, where the Supreme Court had evaluated the search incident to the arrest exception, a similar blanket exception to border search exception, "the Court addressed "whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been

arrested"; in other words, whether cell phones fell within the scope of the search subject to arrest exception. 573 U.S. at 378.

24. The Court considered whether a cell phone search qualified as a search incident to arrest by considering "whether application of the search incident to arrest doctrine to [cell phones] would "untether the rule from the justifications underlying the ... exception."" Id. at 386, quoting Arizona v. Gant, 556 U.S. 332, 343, 129 S.Ct. 1710 (2009).

25. The Court concluded that the the purpose for the search incident to arrest exception did not justify the search of a cell phone.

26. The government may raise the point that Second Circuit has previously ruled on the issue of routine border search and that the search of the traveler's belongings constitute a routine border search.

27. The Defendant asserts that the standard used by the Second Circuit in United States v. Levy, 803 F.3d 120 (2d Cir. 2015), is inapplicable to the instant case. There the Court had declined to rule that copying and retaining eighteen pages of a notebook found in defendant's luggage, by CBP officers, during the border search was routine, due to the fact that CBP officers had reasonable suspicion to believe that defendant was engaged in a stock fraud conspiracy.

28. The Court simply found that it need not determine whether the search was routine or nonroutine. Id. at 123.

29. However, an opinion issued by U.S. District Court located with the Second Circuit had declared that the cell phone search at the border as a nonroutine. The Court in United States v. Bongiovanni, 2022 WL 17481884 at 11 (W.D.N.Y. 2022), found that in light of the Second Circuit's suggestion in Levy, that copying and retaining of personal

information from a traveler's documents for use in a future prosecution may make a border search nonroutine, and the Supreme Court's decision in <u>Reilly v .California</u>, that searches of cell phones are fundamentally different than searches of other types of personal possessions or property, concluded that the border search of the cell phone should be classified as nonroutine.

### ii. Good faith exception does not apply in this case

30. Furthermore, the Government's possible assertion that whether the search should be declared routine or nonroutine is inapplicable, as good faith exception shall apply.

31. Good faith exception applies only to searches where binding, appellate precedent specifically authorizes the police's search. See, <u>Davis v. United States</u>, 564 U.S. 229, 249, 131 S.Ct. 2419 (2011).

32. After <u>Riley v. California</u>, the government cannot continue to argue that *carte blanche* seizure and search of phones at the border is in any way a good faith national security measure, which should be saved by good faith exception.

33. Therefore, the evidence recovered during search of the cell phone that had occurred in secondary inspection area, shall be suppressed as the search was conducted without reasonable suspicion by CBP officers.

### iii. Evidence Obtained via Cell Phones Passwords Provided By Mr. Sultanov Shall Be Suppressed As Mr. Sultanov Was Coerced To Submit the Password to CBP Officers

34. As it is clear from Mr. Sultanov's affidavit, he did not want to provide the password for his phones and did so under duress when he was told that he does not have a choice but to provide the phone.

35. Mr. Sultanov moves to suppress all statements made during the course of his arrest, including his statement identifying the password to his cellphones. and all property

seized, including data retrieved from his cellphones pursuant to a subsequent search warrant, pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

36. The defendant concedes that the airport setting, with respect to questioning, requires some degree of confinement.

37. "In the context of arriving at an airport— "in which compulsory questioning inheres in the situation and the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border"—a reasonable traveler will expect some constraints and questioning." United States v. Djibo, 151 F.Supp.3d 297, 305 (E.D.N.Y. 2015) quoting United States v. FNU LNU, 653 F.3d 144, 153–54 (2d Cir.2011).

38. However, statements made during border interview may qualify as custodial.

39. Miranda warnings are required "in border interrogations when the questioning of the official becomes an interrogation that is custodial in nature and is one in which information is sought for the purpose of using it against a person in a criminal proceeding." United States v. Silva, 715 F.2d 43, 47-48 (2d Cir. 1983).

40. Custody is established if, in light of the circumstances of an interrogation, a reasonable person would have felt that she was not at liberty to terminate the interrogation and leave. Yarborough v. Alvarado, 541 U.S. 652 (2004).

41. Mr. Sultanov asserts that he was in fact in custody at the time of the statements at issue. This is supported by Mr. Sultanov's statement that he wanted to leave but was told by the officers that he can't. Accordingly, after the Government agents had seized his cell phone, U.S. passport, took him to the locked, secured room, a reasonable person would not believe that he could disobey officers, somehow terminate the interview and leave.

42. This logic was outlined by Honorable Thomas J. McAvoy by stating "Under the circumstances, where agents had confiscated Defendants' driver's licenses, seized their property, and directed them to drive to the border patrol station, a reasonable person would not believe they could disobey the agents' directions, terminate the interview, and leave." United States v. Alvarez, 13-cr-009 (N.D.N.Y 2014).

43. Thus Mr. Sultanov was not free to leave once he was asked to step aside to a secondary inspection room, where he was asked to provide the passwords for his cell phones as well as U.S. Passport.

44. It is undisputed that the CBP officer had asked Mr. Sultonov to provide his phone password before any Miranda rights warnings were administered.

45. Once it is established that a defendant was questioned in custody without being advised of his Fifth Amendment rights, "the burden shifts to the government to prove Miranda voluntariness, either because there was no custodial interrogation implicating Miranda, there was some exception to the Miranda rule, or because [the defendant] was properly Mirandized and waived his rights." United States v. Miller, 382 F.Supp.2d 350, 362 (N.D.N.Y.2005) citing Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, (1972); United States v. Anderson, 929 F.2d 96, 98 (2d Cir.1991)).

46. To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U.S. 177, 189, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004).

47. Mr. Sultanov did not want to provide the password but was rather compelled to provide it, solely because he was told that he has to do it.

48. Several courts had reviewed the issue of cell phone password production to the law enforcement agencies and stated that production of cellphone passwords constitutes incriminatory testimony protected by the Fifth Amendment.

49. In <u>In re Grand Jury Duces Tecum Dates March 25, 2011</u>, 670 F.3d 1335, 1352-53 (11th Cir. 2012), the Eleventh Circuit found a person accused of possessing child pornography may assert his Fifth Amendment privilege to avoid decrypting a hard drive. The Court held that "individual's act of decrypting and producing the hard drives' contents was sufficiently testimonial to trigger Fifth Amendment protection." <u>Id</u>. at 1335.

50. In <u>SEC Civil Action v. Huang</u>, No. 15-269, 2015 WL 5611644 at 1-4 (E.D. Pa. 2015), the Court held that the defendants could invoke their Fifth Amendment right against self-incrimination to challenge production of their smartphone passcodes because production of passcodes was testimonial in nature.

51. A revealing reasoning was cited in <u>United States v. Kirschner</u>, 823 F. Supp. 2d 665, 669 (E.D. Mich. Mar. 30, 2010) where the Court quashed subpoena for testimony about computer password on Fifth Amendment grounds because the government sought to require the defendant "to divulge through his mental processes his password – that will be used to incriminate him."

52. The Court further quoted Justice Stevens' majority opinion in <u>United States v. Hubbell</u>, 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000), stating "that Defendant's assembly of documents, in response to the government grand jury subpoena, violated his privilege against self-incrimination … The assembly of those documents was like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a

strongbox." United States v. Kirschner, 823 F. Supp. 2d at 669, quoting United States v. Hubbell, 530 U.S at 43.

53. The same logic was employed by the Court in In the Matter of Search Warrant Application for [Redacted Text], 279 F. Supp.3d 800, 806 (N.D. Ill. 2017) *"The same principle applies here: a person generally cannot be compelled to disclose the passcode (like the safe's combination) but can be compelled to provide the fingerprint (like the key to the safe)."*

54. In a case on point, United States v. Djibo, 151 F.Supp.3d 297 (E.D.N.Y. 2015) *rev'd on other grounds,* 730 Fed.Appx. 52, district court, in reviewing a motion to suppress the contents of the phone, found that the search of the phone had been improper for a number of reasons. One of which, by stopping Djibo, asking him for a passcode, and likely searching his phone *before* arresting him and advising him of his *Miranda* rights, the agents had likely sought "to expand the definition of a 'border search' in a way this Court cannot abide and in a way that invokes Wong Sun v. United States, 371 U.S. 471 (1963) (suppressing drugs found following a warrantless search as 'fruit of the poisonous tree') and its progeny." Id. at 309.

55. Based on analysis of above listed cases, defendant asserts that the production of the cell phones' passwords by him was testimonial and incriminating.

56. As to the voluntariness, the Courts consistently held that a statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." Harris v. Dugger, 874 F.2d 756, 761 (11th Cir. 1989).

57. The crux of the deception in this case is that Mr. Sultonov could refuse to provide a password.

58. There is no obligation codified by law that compels the traveler to provide his cell phone password to the Custom and Border Patrol.

59. Mr. Sultanov had refused to provide the password but was misled by the CBP officer to provide the password because he was told that he has no choice but to provide the password.

60. It is understandable that the Government could seize the cell phone, initiate removal proceeding, etc., had Mr. Sultanov refused to provide the phone's password – but he did not have an obligation to provide such a password.

61. Thus, CBP officer, who had provided Mr. Sultanov with printout stating that the traveler is obliged to provide cell phone password, had essentially misled the defendant, compelling him to release the password to the officers.

62. As a result of providing of the password, Mr. Sultanov provided incriminating information to the Government's agent.

63. Therefore, the statement with respect to the password as well as any evidence that was obtained as a result of such statement, revealing the phone's password, shall be suppressed as fruit of the poisonous tree.

**iv. Mr. Sultanov's Statement Given, After He Was Administered Miranda Rights, Shall Be Suppressed Because It Was Not Given Voluntarily and Was Extracted by Direct and Implied Promises**

64. Subsequently, once Mr. Sultanov was provided with Miranda warnings, he had explained to the officer that he understands the warnings "50/50."

65. Moreover, Mr. Sultanov had asked the officer whether he will not be arrested after providing statements. The officer had replied "Yeh" which meant to Mr. Sultanov that he can make a statement and not be arrested afterwards. (See, Sultanov's Affidavit).

66. "[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986), citing Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572 (1979).

67. By examining Mr. Sultonov's own statement, one can conclude that the defendant was not fully aware of the nature of the right that he abandoned and the consequences of his decision, thus the statement as well as entire evidence derived from the statement shall be suppressed as fruit of the poisonous tree.

### v. Agents' questioning of Mr. Sultanov on March 5, 2022 was fruit of the poisonous tree

68. As argued above, the use of Mr. Sultanov's password, on March 5, 2022, during the border encounter was improper, because that search was improper. Using Mr. Sultanov's phones to then solicit statements from him was "fruit of the poisonous tree," that is evidence derived from other, improperly gathered evidence. Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920); Nardone v. United States, 308 U.S. 338, 341 (1939).

69. The evidence obtained as a result of the improper questioning, including defendant's revelation of his phone's password, shall be suppressed as "fruit of the poisonous tree."

70. Therefore, all evidence obtained by the Government as a result of "fruit of the poisonous tree" shall be suppressed.

WHEREFORE, the defendant through his attorneys respectfully asks this Court to suppress all the statements and evidence obtained by the Government as a result of the border search of the Defendant's cell phones on March 5, 2022.

Date: Brooklyn, New York
February 6, 2023

Respectfully submitted,

/s/ Igor Niman
Igor Niman, Esq.
Attorney at Law
1909 East 17th Street
Brooklyn, NY 11229
Phone: (718) 382-1689
Fax: (718) 228-6633
Email: igor_niman@yahoo.com