UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

Plaintiff

Criminal Docket No. 22-149 (NRM)

v.

KURBONALI SULTANOV

Defendant

_____

# POST HEARING MEMORANDUM

At the completion of the suppression hearing the Court directed both parties to submit memorandum's of law with respect to proposed questions:

1. Provide analysis on instances when any questioning conducted in secondary inspection area, was declared custodial environment.

2. Provide case law for situations, whether good faith exception applies, when Miranda waiver was declared not voluntary and how involuntary Miranda waiver taints warrant application.

### i. SECONDARY INSPECTION AREA WAS DECLARED CUSTODIAL ENVIRONMENT IN NUMEROUS COURT DECISIONS

3. The Second Circuit has held that "Miranda warnings are required in border interrogations when the questioning of the official becomes an interrogation that is custodial in nature and is one in which 'information is sought for the purpose of using it against [a] person in a criminal proceeding." Untied States v. Silva, 715 F.2d 43, 47–48 (2nd Cir. 1983) (quoting United States. v Moody, 649 F.2d 124, 127(2nd Cir. 1981)).

4. The Court in Silva reiterated that Miranda warnings need not be given to one detained at the border and subjected to a routine customs inquiry," United States v. Silva, 715 F.2d at

46; and observed that "questions ... necessary to enforce immigration and customs regulations" generally will not require Miranda warnings. Id. at 47

5. "Miranda warnings are not required in a routine secondary inspection when, as in this case, a reasonable person would consider the questions asked (*e.g.,* name, country of birth, citizenship, etc.) to be relevant to an admissibility or customs determination." United States v. FNU LNU, 653 F.3d 144, 156 (2nd Cir. 2011).

6. Thus, in United States v. Tudoran, 476 F.Supp.2d 205, 211 (N.D.N.Y.2007) the court held that Miranda warnings were required when questions were no longer attempts to discern defendant's alienage.

7. "Miranda warnings are required '[i]f the inspector's questions *objectively* cease to have a bearing on the grounds for admissibility and instead only further a criminal prosecution." Id. at 211 (emphasis in original) (quoting United States v. Long Tong Kiam, 432 F.3d 524, 530 (3d Cir.2006)).

8. The Statement Four in United States v. Tudoran was suppressed when the defendant was in a secondary inspection area next to the lobby.

9. In United States v. Ali, 68 F.3d 1468 (2nd Cir. 1995) the Second Circuit held that whether a stop is reasonable under Terry is irrelevant to the Miranda doctrine because "Terry is an 'exception' to the Fourth Amendment probable cause requirement, not the Fifth Amendment protections against self incrimination."

10. In Ali, a customs inspector at John F. Kennedy Airport in New York City was conducting a routine x-ray examination of luggage when he discovered shotguns in baggage checked under the defendant's name. Seven customs officials, five in uniform with visible weapons, approached the defendant for questioning.

11. He was thereafter isolated, surrounded by customs officials and bombarded with questions. After intense questioning, he admitted that his luggage contained shotguns.

12. He was thereafter arrested and brought to the customs building where he was read his Miranda rights for the first time.

13. The Second Circuit remanded the case to the lower court with instructions to follow the proper inquiry: "whether a reasonable person in Ali's shoes would have felt free to leave under the circumstances." United States v. Ali, 68 F.3d at 1473.

14. The Second Circuit clearly articulated that the test for determining when an accused is in custody is "whether a reasonable person in the defendant's position would have understood himself to be 'subjected to the restraints comparable to those associated with a formal arrest.'" United States v. Ali, 68 F.3d at 1472 (quoting United States v. Mussaleen, 35 F.3d 692, 697 (2d Cir. 1994))

15. Furthermore, "[a]n accused is in "custody" when, in the absence of an actual arrest, law enforcement officials act or speak in a manner than conveys the message that they would not permit the accused to leave." Id. (quoting Campaneria v. Reid, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989))

16. In Ali, the defendant "was "taken aside," away from the line of boarding passengers, to an adjacent corridor or "jetway."" Id. at 1470.

17. After a first decision issued by the 2nd Circuit, 68 F.3d 1468 (2nd Cir. 1995), remanding the case to the district court to determine whether the statements should be suppressed, the Defendant had petitioned for rehearing, pursuant to Rule 40 of the Federal Rules of Appellate Procedure.

18. In a subsequent decision, Second Circuit ruled that the statements made at a jetway shall be suppressed and conviction vacated. United States v. Ali, 86 F.3d 275 (2nd Cir. 1996).

19. The Court had outlined its reasoning, explaining the suppression of the statement made at the jetway:

> Most relevant to our decision here is the following passage describing the events immediately before Ali's interrogation: "Ali was asked to step away from the boarding area, his travel documents were removed, and he was surrounded by seven officers with visible handguns." 68 F.3d at 1473. Furthermore, two of the law enforcement officials testified that they would not have allowed Ali to leave had he tried. 68 F.3d at 1471. Given these facts, we hold that a reasonable person in Ali's shoes would not have felt free to leave. Ali was thus in custody, and Miranda warnings should have been given. They were not.

20. Thus the Court of Appeals for the Second Circuit, had ruled that jetway, something that does not even resemble closed room in the secondary inspection area, due to the lack of doors, is a custodial environment.

21. In United States v. Ramirez, 696 F.Supp.2d 246 (E.D.N.Y. 2010) the defendant was interviewed by CBP officers in the secondary area.

22. The Court held that: "The evidence establishes that Officer Hernandez's questioning during this first phase of defendant's secondary inspection was directed solely toward determining defendant's true identity for admissibility purposes. Thus, this questioning did not require Miranda warnings. Id at 254-255.

23. "Defendant was thus "in custody" at the conclusion of his first phase of questioning and at the time of his second phase of questioning to obtain his sworn statement because he was not free to leave." Id. at 255.

24. The Court concluded that "from the sequence of events, questions asked during the second phase of questioning to obtain defendant's sworn statement, in connection with

defendant's expedited removal, were largely unnecessary to determine defendant's admissibility." Id.

25. Finally, the Court ruled that "[E]xcept for questions related to defendant's possible claim to United States citizenship through a relative or asylum relief, further custodial interrogation during the second phase of questioning to obtain defendant's sworn statement required that defendant first be advised of and waive his Miranda rights. This requirement was not met." Id. at 246.

26. In United States v. McCain, 556 F.2d 253, 254 (5th Cir. 1977), defendant while being in secondary inspection area was provided with "a booklet made up of newspaper clippings reflecting a number of tragedies which had occurred when people had attempted to hide narcotics in their body cavities."

27. Subsequently, after reading the booklet and having a conversation with customs officer who spoke to the defendant the way "a father might talk to a daughter" the defendant "blurted out that, "Yes, I do have narcotics in my body."" Id. at 254.

28. Interestingly enough, the Court held that "if we were to assume Ms. McCain was not being physically restrained from leaving after the strip search, *she was obviously able to leave only if she was willing to abandon her luggage*, and this itself is a sufficient restriction on one's freedom of action so as to trigger the giving of Miranda warnings before proceeding with any interrogation." Id. at 255. (emphasis added).

29. The instant case against Mr. Sultanov, the defendant was not told that he is free to leave if he leaves his phone with the CPB officer, demonstrating that abandoning of his property in the secondary area, is a restriction of his freedom of action, creating a custodial environment that required Miranda warnings.

30. In United States v. Chavira, 614 F.3d 127 (5th Cir. 2010), the Court stated that Defendant's freedom of movement was severely restrained, while being in the secondary inspection area, to the degree a reasonable person would associate with arrest, since defendant's birth certificate and Texas identification were both confiscated. In addition, had the defendant wanted to leave, she would have to first retrieve her belongings from the Government. Id. at 134.

31. In addition, importantly the Court again distinguished between reasonable immigration related questions administered in the secondary detention area and questioning that had "no reasonable immigration related purpose behind further questioning other than to elicit incriminating statements for potential prosecution. Crucially, the case changed from a routine immigration case to an essentially criminal law enforcement case." Id. at 133.

32. In case of Mr. Sultanov, he was in a custodial environment as soon as he was asked to step into the secondary inspection area and provide his phone's password.

33. The officer Pichardo had testified that he had no immigration related issues with Mr. Sultanov.

34. Knowing that he concealed from Mr. Sultanov that he could refuse to provide the phone's answer, leave his phone with CBP officer and walk out, but instead stated that he is not free to leave the secondary are.

35. Officer Pichardo, specifically did not administer any Miranda warnings to avoid subsequent issues with Mr. Sultanov's refusal to provide the cell phone's password.

36. Thus, the secondary inspection area provided a custodial environment akin to the events described in United States v. Ali, where the defendant was not handcuffed but rather not allowed to board the flight, while being surrounded by officers at a jetway.

## ii. GOOD FAITH EXCEPTION SHALL NOT APPLY TO INVOLUNTARY STATEMENTS OBTAINED IN VIOLATION OF MIRANDA RULE

37. The Court in the instant matter had asked the parties to answer a question whether the evidence, obtained in violation of Miranda rule, should not be suppressed because the officers acted in good faith under United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

38. Involuntary confessions are inadmissible evidence under the Due Process Clause of the Fourteenth Amendment and under the Fifth Amendment right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433 (2000).

39. While researching the answer to the question posed by the Court, the undersigned had located few cases, from the State Jurisdiction, that declined to adopt "good faith" exception in Fifth Amendment cases. People v. Smith, 31 Cal.App.4th 1185, 1193 (1995).

40. In State v. Dorff, 468 N.J.Super. 633, 652 (App. Div. 2021), the Court bluntly stated: "There is no "good faith" exception to Miranda."

41. However, since the Federal Courts precedent discussing application of good faith exception in conjunction with Miranda violation, it is important discuss the principles of good faith exception.

42. Looking deeply into the logic of fruits of the poisonous tree doctrine, one realizes that in United States v. Patane, 542 US. 630, 124 S.Ct. 2620 (2004), the Court concluded that the fruit of the poisonous tree doctrine does not extend to derivative evidence discovered as a result of a defendant's *voluntary statements* obtained without Miranda warnings.

43. The Court in Patane had noted that "the Court requires the exclusion of the physical fruit of actually coerced statements … only when necessary to protect the privilege against self-incrimination. Id. at 644.

44. Thus, the Court had distinguished between evidence obtained from unwarned voluntary statements of the defendant and evidence obtained as a result of the coerced, involuntary admission.

45. One of the instance when the good faith exception will not apply is a situation when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth…" United States v. Leon, 468 U.S. at 898.

46. In other words, "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant *if that information was critical to establishing probable cause*. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

47. In this particular instance, officer Joshua Croft submitted a warrant application later on signed by Magistrate Justice James R. Cho, omitted or misstated crucial facts with respect to the information that was crucial to establishing probable cause, thus misleading issuing judge, knowing that the information provided was false.

48. In paragraph 8 of the AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE ("Croft's Affidavit") officer Croft stated that Mr. Sultanov "was stopped by United States Customs and Border Protection ("CBP") at JFK Airport and border search was conducted."

49. The footnote 1 of the Croft's Affidavit, stated that such searches may be conducted without a reasonable suspicion.

50. Officer Croft clearly concealed the fact that the search was conducted based on TECS hit or a lookout issued in connection to Mr. Sultanov.

51. By omitting this language, officer Croft had concealed the fact that the questioning conducted was done not on routine basis in connection with a regular issues concerning the traveler's admissibility into the United States, but to obtain information that may be used in future criminal prosecution.

52. The next sentence of Croft's Affidavit states that "During the search, SULTANOV voluntarily gave CBP officers the password for Device 1."

53. Again, officer misstates the information which was readily ascertainable by asking officer Pichardo as to whether he had provided any Miranda warnings to the defendant, before demand for the phone's password was made.

54. The communication of voluntariness clearly misled the issuing judge, by triggering the notion that voluntary statements obtained without <u>Miranda</u> warnings, do not preclude fruits of the poisoned tree exception.

55. Paragraph 10 of Croft's Affidavit states that "[a]fter being given a Miranda warning and agreeing to waive his Miranda rights, the defendant spoke to law enforcement officers."

56. One more time the officer misled the issuing judge by stating that Mr. Sultanov agreed to waive his Miranda rights when in fact no such waiver occurred due to the defendant statement that he understood such rights 50/50.

57. Thus, even on its face the good faith exception shall not apply in this matter due to the misleading information provided to the Magistrate Judge.

58. It is important to remember that the good faith exception, "is not a magic lamp for police officers to rub whenever they find themselves in trouble. For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts." United States. v. Reilly, 76 F.3d 1271, 1280 (2nd Cir. 1996).

59. Further, the Court in United States v. Reilly held that "Leon held that the exclusionary rule is designed to deter police misconduct, and that this goal is not furthered by the exclusion of evidence obtained under a defective warrant issued in error by a magistrate." Id. at 1281, citing United States v. Leon, 468 U.S. at 916.

60. On the other hand, the purpose of the protection that the Fifth Amendment provides "reflects a judgment that the prosecution should not be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." Doe v. United States, 487 U.S. 201, 212, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988).

61. Thus, to allow officer to use coerced statement to obtain a warrant to search defendant's property based on good faith exception creates a situation that is prone to the abuse of the power.

62. For example, a situation may exist, when one group of officers is set up to conduct interrogations of various arrestee's at the police precinct. If such officers may employ coercive tactics to receive involuntary admissions, they may provide the information obtained from defendants, to a separate group of officers, who are completely segregated from the first group.

63. Then a second group of officers, may apply for search warrants employing the information that was obtained by first group of officers in violation of Miranda, sincerely

claiming that they were not aware of any coercive tactics used by the first group of officers to secure involuntary admissions.

64. Such tactic will circumvent the safeguards established to avoid employment of coercive techniques by law enforcement personnel and allow the usage of such statements against defendants in violation of their rights.

65. Thus, the use of good faith exception to involuntary statements shall be precluded as it creates serious incentives to circumvent the law and proper procedures.

                                          Respectfully submitted,

*Igor Niman*