February 20, 2026

Hon. Nina R. Morrison
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  *United States v. Kurbonali Sultanov*, 22 CR 149

Dear Judge Morrison,

Kurbonali Sultanov is a devoted son, brother, and father, who has no prior convictions. Since his arrest, he has followed stringent pretrial conditions for four years. He has had no pretrial violations. During this time, he has worked, sending a huge chunk of his income home to his many relatives in Uzbekistan, including his disabled son; he has grown closer with his family in Brooklyn; and he has attended his mental health treatment consistently. He has demonstrated with his actions over this lengthy pre-sentencing period that he isn't a risk of committing future crimes. Instead, his plans for the future all surround his family: he dreams of bringing his son to the United States to receive better medical attention, of buying a two-family house (with one half for him, his partner, and her daughter, and the other half for his childhood best friend), of starting a trucking business with this same childhood friend, and of visiting his family in Uzbekistan again.

I am now writing to your Honor in advance of Mr. Sultanov's sentencing.[1] We have no objection to the guideline calculation in the presentence report, but

---

[1] Attached are the following exhibits:

Ex. A, letters from:

- Sultanova Movluda Toshtamovna, Mr. Sultanov's mother
- Sultanov Toshtemir Isakovich, Mr. Sultanov's father
- Sultonov Isoqboy Toshtemir, Mr. Sultanov's brother
- Umarova Moxira, Mr. Sultanov's sister
- Sultanova Irodakhon, Mr. Sultanov's sister-in-law
- Dilfuza Abdulkhairova, Mr. Sultanov's common-law wife
- Abdusamadov Abdumajid Komiljon Ogli, Mr. Sultanov's nephew
- Ziyodulla Mamatqulov, Mr. Sultanov's life-long friend and roommate
- Furkat Djabbarov, Mr. Sultanov's long-time friend and co-worker.

1

respectfully request a non-incarceratory sentence for all the reasons explained below.

### I.    Mr. Sultanov has consistently worked to improve his family's life

"I always wanted something better for my family."

- *Mr. Sultanov, conversation with counsel January 2026*[2]

Mr. Sultanov grew up in a rural area, on the edge of a small town in Uzbekistan. His family raised two cows and four sheep, and grew a variety of crops including tomatoes, cucumbers and corn. The food and animals were used by the family to eat. Mr. Sultanov would walk about 40 minutes each way to the closest local school.

When he was just 19, he got the chance to leave this rural area and improve his family's life. A family friend showed him how to enter the green card lottery to come to the United States and he won. At 19 years old, and speaking no English, Mr. Sultanov moved to the United States. He didn't leave for 5 years and 17 days. That he still remembers – many years later – exactly how many days he was apart from his family, underscores how hard this move was for him as a young man.

Furkat, a family friend from Uzbekistan, who was older than Mr. Sultanov and already living in the United States, helped him find housing and a job. Gradually, Mr. Sultanov started to acclimate. He made friends, found consistent work in trucking, and met his partner Difluza. As he explains it, after the first difficult year, "I loved living here and didn't want to leave."

Today, Mr. Sultanov is someone who his friends in Brooklyn count on for his "warm sense of humor and positivity," for his guidance, and for his emotional support. He is a "reliable colleague" and a "loyal friend." Ex. A (letters from Ziyodulla and Furkat).

---

Ex. B, chart of 24 child pornography cases in EDNY with sentences of time served or probation;

Ex. C, chart of 35 child pornography cases in SDNY with sentences of time served or probation.

[2] Quotes from Mr. Sultanov are from conversations with counsel in January and February 2026, with the assistance of an interpreter.

<u>Mr. Sultanov does all he can to improve the life of his son in Uzbekistan, who was born with a serious disability.</u>

About three years ago, Mr. Sultanov was thrilled to become a father. Mr. Sultanov describes that he saw his son being born in his dreams before he learned that his son was born. But he hasn't been able to meet his son because Mr. Sultanov was arrested before his son was born in Uzbekistan and Mr. Sultanov isn't allowed to travel. At first, Mr. Sultanov wasn't even allowed to see his son on video calls because of his bond restrictions. This has been extremely hard for Mr. Sultanov, who desperately wants to meet his son. What Mr. Sultanov is able to do from afar is provide money to his son, so that is what he does: Mr. Sultanov pays for all of his son's medical treatments. As the PSR notes, if Mr. Sultanov was incarcerated, his "child would not receive necessary medical care, as [he] is the sole financial provider for this medical care and there are no family members who would be capable of helping financially." PSR 17.

As the PSR also notes, Mr. Sultanov is no longer in a relationship with his legal wife, and the mother of his son, in Uzbekistan. PSR 9. Their marriage was arranged in 2021; Mr. Sultanov's parents chose his wife, who is a relative of his brother's wife. This type of arranged marriage is common in Mr. Sultanov's rural Uzbek culture. From his parent's perspective, this marriage was beneficial to further join his brother's wife's family to Mr. Sultanov's family. Culturally, it wasn't an option for Mr. Sultanov to refuse this arranged marriage, even though he was already in a committed relationship with Dilfuza, here in Brooklyn. He was raised to do what his parents instructed and not to disappoint them. He is a dutiful son. As his father explained in a phone call, "In our culture, the son always listens to his father and is very respectful. That is how he is for me. He doesn't refuse or reject the advice from dad or mom."[3]

Mr. Sultanov continues to be in a loving and committed relationship with Dilfuza, here in Brooklyn. They consider themselves married and live together as a family, with her adult daughter. Dilfuza was aware of his arranged legal marriage, and is fully supportive of Mr. Sultanov, explaining to probation that he is a "very good person." PSR 9. As she writes to the court, he is "responsible, loyal, and family-oriented." Ex. A. He has also "become a true father" to her daughter, providing her "genuine fatherly love and care."

---

[3] Call with interpreter on February 13, 2026.

<u>Mr. Sultanov provides financial support to his entire extended family in Uzbekistan</u>

"From childhood, I learned that first you support your family. I don't save any money. Any savings I have goes to my family."

– *Mr. Sultanov, conversation with counsel 2-12-26.*

Mr. Sultanov's father had a heart attack recently. PSR 8. His mother is also ill. PSR 8. She is a "Group II disabled individual," a disability classification in Uzbekistan, which means that she needs assistance in her daily life activities. Mr. Sultanov sends his parents money every month. He has paid for them to move to a new home, bought their cars, paid their medical bills, and he continues to support their day-to-day needs.

Mr. Sultanov doesn't only support his parents, but also supports all seven people who live in his parents' home: his mom and dad; his brother, wife, and their two children; and the child of his sister, who died. Of that group of seven, only Mr. Sultanov's brother works. Mr. Sultanov pays the bulk of their expenses, and they all rely on him. He also paid for his nephew to go to school in Tashkent, the capital of Uzbekistan. Ex. A (letter from Abdumajid). Because of Mr. Sultanov's support, his nephew speaks English – he is the only one in the family who does – and has a good job. Similarly, Mr. Sultanov pays for the bulk of the expenses in his Brooklyn household. If he were incarcerated, numerous people here and abroad would be without money for basic necessities.

Of course, it is not just financial support that Mr. Sultanov provides to his family. He is also a "consistent source of love," "compassion," and "encouragement." Ex. A. When I spoke to his mother about him, she was in tears throughout the conversation and his father also explained that she can't talk about him now without crying. They all miss him terribly.

II. **<u>The Court should not rely on the child pornography guidelines which propose overly harsh sentences</u>**.

Notwithstanding Mr. Sultanov's lack of any criminal history or hands-on offenses, his recommended guideline sentence produces a guideline range from 6 ½ to 8 years of incarceration, or 78 to 97 months. A guideline sentence here would be much too long. While the Court is required to consider the Sentencing Guidelines, it can reject them for any reason, including policy disagreements with the guidelines.

4

*Gall v. United States*, 552 U.S. 38 (2007). The guideline range here well out of step with the appropriate sentence.

The Second Circuit urges caution when using the guideline for child pornography offenses, U.S.S.G. § 2G2.2, because this guideline "is fundamentally different from most and, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Jenkins*, 854 F.3d 181 (2d. Cir. 2017) (citing *United States v. Dorvee,* 616 F.3d 174 (2d Cir. 2010) (calling § 2G2.2 "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results"). Unlike other guidelines, the child pornography guideline was not formulated by the Sentencing Commission using an empirical approach based on past sentencing data, but was instead based on mandates from Congress requiring harsher and harsher penalties. *Dorvee*, 616 F.3d at 184-186. *See also United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) (like crack guidelines, district courts may vary from § 2G2.2 based on policy disagreement with them, and not simply based on an individualized determination in a particular case); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (same).

*Jenkins, Dorvee*, and other cases criticize the various ways in which § 2G2.2 can be seen as containing "all-but-inherent" enhancements, bringing sentences for people who have viewed child pornography in line with sentence of people who have committed "hands on" offenses, among other "irrationalit[ies]." *Jenkins*, 854 F.3d at 189 ("it was substantively unreasonable for the district court to have applied the § 2G2.2 enhancements in a way that placed Jenkins" at a guideline range where he "did not belong."). The *Dorvee* court reached a similar conclusion, noting that the typical guideline calculation for child pornography is much higher than guideline calculations for offenses involving the use of guns or violence. *Dorvee*, 616 F.3d at 187-188. Accordingly, the Second Circuit has indicated it will "apply particular scrutiny to sentences based on Guidelines § 2G2.2." *United States v. Bourque*, 520 Fed. App'x 23, 25 (2d Cir. 2013).

Mr. Sultanov's guideline range is emblematic of these problems. Notwithstanding that his conduct here was within the run-of-the-mill for a child pornography possession case, and his lack of any criminal history, his recommended guideline sentence produces over a 6-year bottom of the guidelines recommendation based on enhancements that are applied in essentially every child pornography case.[4]

---

[4] As the United States Sentencing Commission has explained, "Due to advancements in technology, enhancements that were only intended to apply to the most serious child pornography

5

*See Bourque*, 520 F. App'x at 25 (noting favorably that the district court had "refrained from automatically applying enhancements merely because they technically applied under the Guidelines").

Moreover, data shows that in New York courts rarely sentence people convicted of child pornography offenses to guideline terms. In fiscal year 2024, Eastern District of New York courts varied from the guidelines in 84.4% of child pornography cases. *See* United States Sentencing Commission, Statistical Information Packet Fiscal Year 2024, Sentence Imposed Relative to the Guideline Range by Type of Crime, Table 10, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/nye24.pdf.[5]

Indeed, non-incarceratory sentences for individuals convicted solely of possession of child pornography – like Mr. Sultanov – are common in this District. *See, e.g.*, *United States v. Jairo Ferreira*, 20-cr-229 (MKB) (time served – 1 day – and five years of supervised release); *United States v. Zeeshan Mughal*, 20-cr-488 (NGG) (same); *United States v. Lothar K. Maelzner*, 18-cr-630 (MKB) (same); *United States v. Richard Bien-Aime*, 18-cr-665 (PKC) (same); *United States v. Aaron Robinson*, 16-cr-622 (FB) (five years' probation); *United States v. Seberino Rivas*, 16-cr-161 (PKC) (five years' probation); *United States v. Yang Kim*, 16-cr-191 (PKC) (five years' probation); *United States v. Peter Ferrell*, 15-cr-331 (CBA) (time-served – one day – and six years of supervised release); *United States v. Richard A. Allen,* 15 CR 620 (ILG) (four years of probation); *United States v. Jones*, 11-CR-230 (ARR) (five years of probation with three months of home confinement);

---

offenses were routinely applied to most non-production child pornography offenders." U.S. Sent'g Comm'n, Federal Sentencing of Child Pornography: Non-Production Offenses, June 2021, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf. As this report explains, in fiscal year 2019, enhancements for use of computer, age of the victim (including having images of an infant or toddler), and having more than 600 images apply in the "vast majority of cases," and thus fail to show any aggravating factor. *Id*. *See also* U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (Dec. 2012), available at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses (noting that the enhancements in the child pornography guidelines "now apply to most," so the guideline "fail[s] to differentiate among [people] in terms of their culpability" and "result[ ] in guideline ranges that are overly severe for some" people).

[5] SDNY data is similar: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/nye24.pdf (showing that only 21.4% of child pornography sentences in 2024 were within the guidelines).

*United States v. Alessi*, 12-CR-157 (BMC) (time served – one day – with seven years of supervised release); *United States v. Mangual*, 12-CR-170 (JBW) (five years of probation); *United States v. Wayne*, 12-CR-436 (ILG) (five years of probation with twelve months of home confinement); *United States v. Roth*, 13-CR-392 (ILG) (five years' probation with 100 hours of community service); *United States v. Stokes*, 13-CR-404 (NGG) (time served – one day – with five years of supervised release); *United States v. Maliza*, 13-CR-628 (FB) (three years of probation); *United States v. Gonzalez*, 14-CR-116 (RJD) (five years of probation); *United States v. Mule*, 14-CR-269 (NGG) (time served – one day – with ten years of supervised release); *United States v. Arkhangorodskiy*, 14-CR-283 (JG) (time served – four days – with five years of supervised release, 200 hours of community service, and six months of home confinement); *United States v. Bertrand*, 14-CR-286 (RJD) (four years of probation); *United States v. Vasquez*, 14-CR-316 (JBW) (time served – five days – with seven years of supervised release); *United States v. Hernandez*, 14-CR-00435 (BMC) (four years' probation). *See* Ex. B (chart of 24 child pornography cases in EDNY with sentences of time served or probation). The same is true in the Southern District. *See* Ex. C (chart of 35 child pornography cases in SDNY with sentences of time served or probation).

Your Honor too should find that the guidelines are too high for Mr. Sultanov and that a non-incarceratory sentence is appropriate.

III. **The goals of sentencing would be better served by treatment and continued engagement with his family, not prison.**

Mr. Sultanov fully recognizes the gravity of his crime. For the past four years, he has been in treatment, where his therapist has found him to be "engaging, forthcoming, motivated, and open to feedback." PSR 11. As his therapist explained in a phone call with a member of the defense team, his attendance has been "perfect – he hasn't missed a session in three years." She also explained that he had "worked consistently to maintain stability in work settings, at home, and in his social and family relationships." No "acute concerns" had "arisen during the therapeutic process." Mr. Sultanov himself has also described benefiting and growing from his treatment. As he explains it, "in the beginning, I was in a deep depression. I didn't think the treatment would make any difference. But, when I finally got started, I realized that it was helping me."

A sentence that focuses on treatment and supervised release or probation, as opposed to custody, is still a sentence that reflects the seriousness of the offense. Indeed, harsh punishment and prison terms often have the opposite of their intended

7

effect: rather than deterring crime, an overly punitive response destabilizes people, interfering with positive community ties, and driving them into communities of other people convicted of crimes.[6]

It is also axiomatic that "[i]mprisonment is not the only way we punish." *United States v. Zimmerman*, 2012 WL 3779387 (E.D.N.Y. 2012) (citing *Gall v. United States*, 552 U.S. at 48–49 (2007)). Mr. Sultanov has and will be punished: he spent three days incarcerated at the beginning of this case, apparently because he was arrested on a Saturday and not arraigned until a Monday. PSR 1; Dkt. 3. When he was arrested, he was still bleeding from surgery. PSR 10. He was in stress and shock and didn't receive medical treatment. Additionally, for four years, his movements have been restricted through home detention, confinement, and curfew. A conviction for a felony is itself also a serious punishment and he will be required to register as a sex offender, which has numerous collateral consequences, including making it more difficult for him to receive mental health and drug treatment, housing, and employment. These are real and serious punishments. *See United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (appropriate for the district court to consider the lasting effects of being required to register as a sex offender under Section 3553); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," in child pornography case because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence").

I respectfully urge you to sentence Mr. Sultanov to time served and supervised release or probation. This sentence would be sufficient, but not greater than necessary to serve the goals of 3553(a).

Respectfully submitted,

/s/_____

---

[6] People convicted of child pornography offenses also generally tend to have lower recidivism rates than other defendants. *See, e.g.*, Philip H. Witt, *Assessment of Risk in Internet Child Pornography Cases*, 11 Sex Offender Law Report 1, 14 (Dec./Jan. 2010) (summarizing recent recidivism research which yields recidivism rates of between 0.8% to 8% for child pornography offenders); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent and Sex Offending*, 9 BMC Psychiatry 43 (2009) (finding six-year recidivism rate to be 0.8% for contact offense and 3.9% for non-contact sexual offense); *C.R.*, 792 F. Supp. 2d at 441-42 (summarizing meta-analysis research as showing 13% recidivism rate for sex offenders).

8

Igor Niman, Esq.  
Attorney for the Defendant  
1909 East 17th Street  
Brooklyn, NY 11229  
Phone: (917) 254-1297  
Email: igor_niman@yahoo.com